**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Tamra Balding-Margolis, et al., | ) | CASE NO.  1:07 CV 3363 |
| | ) | |
| Plaintiffs, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Cleveland Arcade, LLC, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

<u>Introduction</u>

This matter is before the Court upon defendants' Motion for Summary Judgment
(Doc. 33) and defendants' Motion to Strike Plaintiff Tamra Balding Margolis's Affidavit
(Doc.39).  This case arises out of plaintiff's termination of employment with defendants. For
the following reasons, defendants' Motion for Summary Judgment is granted and defendants'
Motion to Strike Plaintiff Tamra Balding Margolis's Affidavit is granted to the extent it
contradicts plaintiff's prior deposition testimony, as discussed herein.

<u>Facts</u>

Plaintiffs, Tamra Balding-Margolis (hereafter referred to as plaintiff) and Steven
Margolis (collectively, plaintiffs), filed this lawsuit against defendants, Cleveland Arcade,
LLC dba Hyatt Regency Cleveland at the Arcade, Hyatt Corporation (hereafter, Hyatt),
Global Hyatt Corporation, Joey Schultz, Stephen Stewart, Wendy Leuders, Donald J.
Murtaugh and Old Arcade, LLC (collectively, defendants).[1]  The Second Amended Complaint

---

[1]     Defendants assert that Cleveland Arcade, LLC, Old Arcade LLC and Global
        Hyatt Corporation should be dismissed from this action because they were not
        plaintiff's  employer.  Rather, plaintiff was employed only by Hyatt.  Plaintiff

sets forth twelve claims.  Count one alleges age discrimination under the Age Discrimination in Employment Act (ADEA) and the Ohio Revised Code.  Count Two alleges wage discrimination under the ADEA, Title VII, the Equal Pay Act (EPA) and the Ohio Revised Code.  Count Three alleges sexual harassment and discrimination under Title VII and the Ohio Revised Code.  Count Four alleges retaliation under the various state and federal statutes.  Count Five alleges ratification under Ohio law.  Count Six alleges intentional infliction of emotional distress.  Count Seven alleges loss of consortium.  Count Eight alleges negligent hiring, retention, supervision and training.  Count Nine alleges wrongful discharge in violation of public policy.  Count Ten alleges defamation.  Count Eleven alleges breach of contract.  Count Twelve alleges negligence.

Plaintiff was hired by Hyatt on August 8, 2005 as a server in "The 1890" restaurant (hereafter, the restaurant) at the Hyatt Regency Cleveland at the Arcade.  As a server, she was a member of the Union and covered by the Collective Bargaining Agreement (CBA).  (pltf. aff.; pltf. depo. 39, 41) During the relevant period herein, defendant Schultz was plaintiff's immediate supervisor.  (pltf. depo. 44) Defendant Leuders was Director of the Human Resource Department of the Hyatt in Cleveland.  Defendant Murtaugh was Director of Security at the Hyatt Regency Cleveland at the Arcade.  Defendant Stewart was the General Manager of the Hyatt in Cleveland.  (Second Am. Compl.)

When plaintiff was hired, she viewed a video regarding Hyatt's harassment policy. Plaintiff also received a copy of Hyatt's Policy Against Harassment which prohibited

---

does not dispute this.  Accordingly, these defendants are dismissed for the reasons stated by defendants.

harassment or retaliation on the basis of, *inter alia,* gender and age.  The policy instructed that any relative concerns were to be reported to an immediate supervisor.  If the problem involved the employee's manager, or the employee felt the matter could not be discussed with that manager, the policy stated that the matter should be reported directly to the Human Resources Director, General Manager, or a hotline which phone number was provided.  Plaintiff also received a copy of the Associate Handbook which contained an "open door policy," stating that problems should be discussed with the immediate supervisor, Human Resources, or the General Manager.  (pltf. depo. 93-105 and Exs.)

Plaintiff understood that Hyatt had a cash handling policy, and that part of the policy included turning in all appropriate paperwork.  (pltf. depo. 144; Ex. 10) Plaintiff understood that she was required to turn in signed credit card slips, coupons used and other documentation.  If tips exceeded cash collected during the shift, the server completed a "due back" form, and the manager paid the server the amount due by the next business day.  Any alteration on a guest credit card or room receipt was strictly against the policy.  (*Id.* 148-150)

In October 2005, plaintiff was issued a verbal warning when two guests signed their check for breakfast but did not leave a room number or legible name.  In January 2006, plaintiff was issued another verbal warning regarding "due back" paperwork.  In May 2006, plaintiff was issued a final written warning for altering a guest check.  (*Id.* 142-152) Plaintiff was not disciplined again until her termination in May 2007.

Hyatt terminated plaintiff's employment effective May 13, 2007, based on cash handling policy violations and misappropriation of hotel funds. (pltf. depo. Ex. 12)  Schultz avers the following.  On May 9, 2007, Schultz conducted a routine review of the day's sales

transactions and discovered that plaintiff's gratuities equaled 32.29% of her total sales, without the inclusion of cash tips.  Based on this unusually high percentage, Schultz audited plaintiff's transactions for that day, as well as the transactions of the other two servers that were working the same shift as plaintiff. Schultz also contacted plaintiff to inform her that she was being suspended pending a disciplinary investigation.  At the conclusion of the audit, Schultz discovered that plaintiff had committed multiple violations of Hyatt's cash handling policy.  (Schultz aff.)   In particular, plaintiff rang up more coupons for free breakfasts than coupons she submitted; plaintiff submitted ten checks without a signed copy of a room charge, credit card receipt, or other supporting documentation; and plaintiff submitted checks without signed receipts where the amount of the tip was grossly disproportionate to the amount of the bill. (pltf. depo. Ex. 12)

Based on this audit, Schultz and Hyatt Controller Michael Ciuni conducted an additional audit of plaintiff's transactions on April 25, May 1 through 4 and May 8 of 2007. That audit revealed additional violations of Hyatt's policies and procedures on each of these dates.  (Schultz aff.)  For example, plaintiff closed out checks and room charges without signed receipts, posted a gratuity without a purchase and failed to submit coupons which were rung up. (pltf. depo. Ex. 12).  A later audit of checks closed out by all of the servers on April 25, May 1 through 4 and May 8 and 9 of 2007 showed that many of the servers had no discrepancies and no cash handling policy violations.  The issues identified were of an isolated nature or clearly errors. After her termination, Hyatt conducted further review of plaintiff's transactions and found other cash handling violations.  (Schultz aff.)

Schultz and Leuders recommended that plaintiff be terminated.  Stewart and Ciuni

4

agreed, with Stewart approving the decision. Accordingly, on May 12, 2007, plaintiff was informed of her termination. Present at the termination meeting were plaintiff, Schultz, Leuders and Barbara Winters, the Union Steward. At her termination meeting, plaintiff was told the reason for her discharge and given the opportunity to find the relevant missing documentation, but never did so. (Schultz aff.; Leuders aff.; Winters aff.; Stewart aff.; pltf. depo. Ex. 12)

After her termination, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that she had been retaliated against, and discriminated against on the basis of her age and gender. The Union also filed a grievance on behalf of plaintiff alleging that she had been unjustly terminated in violation of the CBA. The Union ultimately decided not to take the grievance to arbitration, and it was dismissed. Plaintiff did not appeal the Union's decision beyond the local Union president. Finally, Plaintiff filed an unfair labor practice charge against Hyatt with the Department of Labor alleging that she was terminated in violation of her rights under the National Labor Relations Act. Plaintiff voluntarily withdrew the charge. (pltf. depo. 203-224; Exs. 14, 16, 19)

As the Second Amended Complaint contains numerous allegations, the facts relevant to the various claims will be addressed in the discussion regarding that claim.

This matter is now before the Court upon defendants' Motion for Summary Judgment.


**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600,*

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates
> the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its

resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of [his] pleadings, but [his
> response], by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is genuine issue
> for trial.  If he does not respond, summary judgment, if
> appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most

favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th

Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must

"produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

6

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Age Discrimination (Count One)**

Count one alleges age discrimination under the ADEA and the Ohio Revised Code. Plaintiff's state law age discrimination claim is analyzed under the burden shifting analysis applicable to ADEA claims.  *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir.2005).  In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie violation of the ADEA by showing that she (1) was at least 40 years old at the time of the alleged discrimination; (2) was subjected to an adverse employment action; (3) was otherwise qualified for the position; and (4) was replaced by a younger worker or similarly situated non-protected employees were treated more favorably. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir.2008); *Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307 (6th Cir. 2007).

If an ADEA plaintiff makes out a claim of prima facie discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant provides such a reason, the burden shifts back to plaintiff

7

to show that the reason was pretextual.  *Id.*

Plaintiff asserts that she has direct evidence of age discrimination.  "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Goller v. Ohio Dept. of Rehabilitation and Correction,* 2008 WL 2796080 (6th Cir. July 18, 2008) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003)). "It does not require the fact finder to draw any inferences to reach that conclusion." *Talwar v. Catholic Healthcare Partners*, 258 Fed.Appx. 800 (6th Cir. 2007) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000) ). "Discriminatory comments can constitute direct evidence of discrimination provided that they were made by an individual involved in the decision-making process regarding the plaintiff's employment. Conversely, comments made by individuals not involved in the decision-making process do not constitute direct evidence of discrimination." *Benjamin v. Brachman*, 246 Fed.Appx. 905 (6th Cir. 2007 ) (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir.2003) and *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir.2002))

Plaintiff testified at deposition that Schultz "always" called her  "mom."  (pltf. depo. 130-131)   In her affidavit, plaintiff avers that during her employment, she "was repeatedly, if not daily, called 'mom,' 'mother,' or 'okay mom' by Schultz."  (pltf. aff. ¶ 37)[2] Plaintiff also submits the affidavit of Lillian Rose McMarlin, a former bartender at the Hyatt restaurant,

---

[2]  As discussed in more detail below, defendants have moved to strike the portions of plaintiff's affidavit which conflict with her prior deposition testimony.  While plaintiff's deposition states that Schultz "always" called her "mom," and her affidavit characterized it as "daily," any conflict here is not critical to whether the "mom" comments are direct evidence.

8

who avers that she "witnessed" Schultz call plaintiff "mom" on a Sunday in April 2007.
(McMarlin aff. ¶ 20)

While plaintiff states in her deposition that she regarded this as a comment about her
age, plaintiff asserts elsewhere in her brief that "[t]hese remarks were unwelcome because
they singled out plaintiff on the basis of her sex and status as a mother."  (Doc. 36 at 2-3)
Indeed, plaintiff contends that these comments are direct evidence of her sex discrimination
claim as they are "gender based."  (*Id.* at 28) This underscores the conclusion that these
remarks are ambiguous in nature and, therefore, cannot constitute direct evidence of age
discrimination.  *See Skelton v. Sara Lee Corp.,* 249 Fed.Appx. 450 (6th Cir. 2007) (Comments
that are merely vague, ambiguous, or isolated do not constitute direct evidence.)  Moreover,
defendants point to the absence of evidence showing that Schultz's remarks were related in
any way to the decision-making process.  On this basis as well, the remarks do not constitute
direct evidence of age discrimination.  *See Birch v. Cuyahoga County Probate Court*, 392
F.3d 151 (6th Cir. 2004) ("[S]tatements made by decision makers that are not related to the
decisional process itself do not satisfy the plaintiff's burden of demonstrating direct evidence
of discriminatory animus.")

In the absence of direct evidence, plaintiff must proceed by establishing a prima facie
case.  Defendants assert that plaintiff cannot satisfy the fourth element, i.e., that she was
replaced by a younger worker or that younger workers, who were similarly situated, were
treated more favorably.

Plaintiff asserts that she was replaced by Justin Flores, a 26 year old male.  (Doc. 36 at
29; pltf. aff. ¶ 40)  The evidence does not show, however, that plaintiff was replaced by this

younger male.  Plaintiff testified at deposition:

> Q.  After you were terminated, do you know whether or not you were replaced?
>
> A.  I know that Justin was put on the schedule more on the restaurant side.
>
> Q.  And where was he working before that?
>
> A.  In the lounge and before that he was a manager.
>
> Q.  So he'd been demoted from being a manager or stepped down from being a manager?
>
> A. Correct.
>
> Q.  And prior to your termination worked more in the lounge?
>
> A.  Yes.

(pltf. depo. 196-197).

As recently recognized, "The Sixth Circuit has held that an employee is not "replaced" when one or more employees assume the plaintiff's job duties while retaining former job titles and responsibilities." *Barnes v. Federal Exp. Corp.*, 2007 WL 405686 (E.D.Mich. February 1, 2007) (citing *Godfredson v. Hess & Clark, Inc.*, 173 365, 373 (6th Cir.1999) ). Plaintiff's own testimony is that Flores already worked for defendants in the lounge and after plaintiff's termination he "was put on the schedule more on the restaurant side."  Thus, plaintiff has not demonstrated that she was replaced by Flores.

Next, plaintiff asserts that younger co-workers were treated more favorably than plaintiff.  Again, plaintiff fails to demonstrate such.

To satisfy the similarly situated requirement, a plaintiff must show that the comparable employee is similar "in all of the relevant aspects." *Ercegovich v. Goodyear Tire*

10

*& Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (citing *Pierce v. Commonwealth Life*

*Insurance Co.*, 40 F.3d 796, 802 (6th Cir.1994) ).  "In announcing the "all of the relevant

aspects" standard, *Ercegovich* narrowed this court's prior holding in [*Mitchell v. Toledo*

*Hosp*., 964 F.2d 577, 583 (6th Cir.1992)], which had required that the plaintiff and the

comparable employee be "similarly situated in all respects." *Barry v. Noble Metal Processing,*

*Inc.,* 276 Fed. Appx. 477 (6th Cir. 2008).  Accordingly,

> While the precise aspects of employment that are relevant to determining whether the
> similarly situated requirement has been satisfied depend on the facts and
> circumstances of each case, this court has generally focused on whether the plaintiff
> and the comparable employee: (1) share the same supervisor; (2) are subject to the
> same standards; and (3) have engaged in the same conduct without such
> differentiating or mitigating circumstances that would distinguish their conduct or the
> employer's treatment of them for it.

*Id.* (citing *Ercegovich,* 154 F.3d at 352).

Plaintiff points to the following.

Plaintiff testified that she saw Justin Flores "marrying alcohol" (combining two half-

full bottles), which plaintiff knew to be illegal under Ohio law.  Yet, he was not disciplined.

(pltf. depo. 140) But, plaintiff also testified that she was never disciplined for marrying

alcohol either, or for refusing to do so although instructed.  (*Id.* 138-140) Thus, plaintiff does

not show that Flores was treated more favorably.

Plaintiff avers that on St. Patrick's Day 2007, Schultz threatened to fire Lisa Yoder,

who was under the age of 40, for intentionally discarding white cash receipts.  Yet, she was

never disciplined or terminated.  (pltf. aff. ¶ 42-43).  Plaintiff, however, testified earlier at

deposition that she did not know whose receipts Schultz found on St. Patrick's Day.  (pltf.

depo. 199) Without evidence, other than plaintiff's own self-serving affidavit testimony,

11

showing that a younger employee was not disciplined for engaging in behavior for which
plaintiff was terminated, the Court is unable to determine whether a younger employee was
treated more favorably.

Plaintiff also avers that male employees Justin Flores, Tim Dougan and Devon Settles[3]
were never investigated or disciplined for violating Hyatt policies regarding attendance,
threatening violence, cash handling, handling of liquor and coming to work intoxicated.  And,
plaintiff avers, she frequently observed other restaurant employees under the age of 40 fail to
close out checks without receipts and attach coupons to receipts, without discipline.  Finally,
plaintiff avers that Devon Settles told her that he never turned in his server's paperwork.
(pltf. aff. ¶ 44)

Plaintiff testified at deposition that she was never disciplined for coming to work
intoxicated or for engaging in any harassing behavior while at work.  (pltf. depo. 140-141)
Thus, she does not show that she was treated less favorably for engaging in the same conduct.
Plaintiff now generally avers that she was disciplined for being late to work in May 2007, but
she has no specific evidence showing that younger male employees were not disciplined for
the same offense.

At most, plaintiff argues that younger male employees were not disciplined for
violating Hyatt policy.  However, plaintiff has not shown that they were not disciplined for
violating the cash handling policy in the same manner as plaintiff did.  Plaintiff testified that
she assumed Devon Settles engaged in cash handling violations because at one point he

_____

[3]       Plaintiff testified elsewhere in her deposition that all of the male servers were
younger than she.

laughed and said he rarely turned in paperwork.  She also testified, however, that she could not say specifically whether any member of management knew about it.  (pltf. depo. 200-201) Additionally, she testified that she assumed Tim Dougan committed cash handling violations because he said that the coupons were a joke and "you just ring in what you want to ring in." (*Id.* 201) But, plaintiff testified that she knew nothing more specific.  On this basis, Settles and Dougan are not valid comparators because there is no evidence that they engaged in the same conduct as plaintiff and were treated more favorably.

Because plaintiff fails to point to evidence showing that she was replaced by a younger worker or that younger employees who violated the same cash handling policies as she had were neither disciplined nor terminated, plaintiff fails to satisfy the fourth prong of her prima facie case.  Accordingly, plaintiff's age discrimination claims fail.

Furthermore, as discussed below with regard to the retaliation claim, plaintiff fails to establish pretext.

### (2) Wage Discrimination (Count Two)

Count Two alleges wage discrimination under the ADEA, Title VII, the EPA and the Ohio Revised Code.  Plaintiff also alleges that defendants have violated Hyatt policy and the CBA.  In particular, plaintiff alleges that she was not paid wages equal to male and/or younger employees.[4]

---

[4]     While plaintiff alleges that defendants' discrimination in the payment of her wages on the basis of her sex and age violates the CBA, the Equal Pay Act, Title VII, the ADEA and the Ohio Revised Code (Second Am. Compl. ¶¶ 144-150), plaintiff now asserts in her brief that the Fair Labor Standards Act (FLSA) has also been violated. Plaintiff cannot assert this new claim in summary judgment briefing.

13

As provided by the CBA, plaintiff initially earned $3.34 per hour, plus tips as a server. In January 2006, plaintiff received an increase in her hourly pay to $3.44 per hour.  (pltf. depo. 39-41; Exs. 2, 3) At one point, Joe Serreyn, the Food and Beverage Manager, asked plaintiff whether she would be interested in participating in Impact Training- an on-the-job training program for servers.  Plaintiff agreed, and she was responsible for training servers. When new servers who were being trained accompanied plaintiff to the tables, plaintiff was told to give some of her tips to the trainees.  Plaintiff declined to do so because she did not consider that to be fair given that she was paying income tax on the tips.  Plaintiff was also required to attend some meetings associated with the Impact Training. Plaintiff was the only impact trainer within the restaurant. Plaintiff was told by Serreyn that she would not be given additional pay to do the training "but he would take care of it in other ways."  On one occasion, plaintiff was given a $25.00 gift card from Target. At some point, plaintiff complained to Serreyn that she should be paid a higher hourly rate when doing the Impact Training. Plaintiff "might" have complained to Schultz and Stewart as well, especially after learning from Nikki Occhino, a Hyatt Corporate Trainer, that other Hyatts paid their impact trainers more money. At one point, plaintiff did begin to receive a higher rate of pay for the training. (pltf. depo. 48-70)

Defendants argue that plaintiff's claims are preempted under Section 301 of the Labor Management Relations Act (LMRA). Plaintiff does not address the issue of preemption.  For the following reasons, this Court agrees with defendants.

Clearly, plaintiff's claim for breach of the CBA is preempted as discussed below with regard to Count Eleven.  Additionally, at a minimum, plaintiff's state law assertions are

14

preempted by § 301 of the LMRA because they require interpretation of the CBA.  *Gilreath v. Clemens & Co.*, 212 Fed.Appx. 451 (6th Cir. 2007) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988) ) ("[A]n application of state law is preempted by § 301 of the [LMRA if] such application requires the interpretation of a collective bargaining agreement.") and *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir.1989) ("§ 301 of the LMRA preempts any state law claim arising from a breach of a collective bargaining agreement"). "Accordingly, a § 301 suit preempts state law claims inextricably bound up in an interpretation of a collective bargaining agreement, as well as state law claims brought to vindicate an employee's rights under such an agreement." *Gilreath, supra.*

Plaintiff admits that her pay rates are dictated by the CBA.  (pltf. depo. 73) Additionally, examination of the CBA shows that it clearly governs the amount of wages paid.  (*Id.*, Ex. 3)

A preempted breach of contract claim actually presents a hybrid § 301 suit for breach of a labor contract which requires the plaintiff to prove both that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation of the employee. *Simoneau v. General Motors Corp.*, 85 Fed.Appx. 445 (6th Cir. 2003).

At a minimum, plaintiff is unable to establish a breach of the CBA because she did not exhaust her contractual remedies by filing a grievance regarding her pay.  A § 301 plaintiff is barred from bringing suit in federal court unless that plaintiff has first sought relief through the grievance procedures provided for under the CBA governing her employment. *Burneson v. Thistledown, Inc.*, 2007 WL 1339839 (6th Cir. May 7, 2007) (citations omitted). Plaintiff's only Union grievance related to her alleged unjust termination.  Therein, plaintiff asserted that

15

she had done nothing wrong to warrant immediate dismissal, and was terminated without just cause. Plaintiff never requested that the Union file a grievance regarding pay for conducting the Impact Training. (pltf. depo. 75-76; Winters aff.)

Even assuming plaintiff's claims are not preempted, these claims fail as plaintiff must show that members outside the protected class were paid more.  Plaintiff presents no evidence that any younger and/or male server (or any server) at the Cleveland Hyatt was given a higher pay to train employees.  Thus, plaintiff cannot show wage discrimination on the basis of her sex or age in violation of the federal anti-discrimination statutes.

For these reasons, summary judgment is granted as to the wage discrimination claim.

**(3) Sexual Harassment and Discrimination (Count Three)**

**(a) hostile work environment**

Plaintiff alleges that she suffered a sexually hostile work environment.  To establish a prima facie case, plaintiff must show by a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability. *Thornton v. Federal Express Corp.,* 530 F.3d 451 (6th Cir. 2008) (citing *Hafford* v. Seidner, 183 F.3d 506, 512 (6th Cir.1999).  Defendants assert that plaintiff cannot establish the fourth or fifth elements.

With respect to the fourth element, the standard which must be met is well-recognized:

[T]he Supreme Court has clarified that in order to be actionable, the hostile work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. To determine whether an environment is sufficiently hostile or

16

abusive, a court must consider all of the circumstances, including the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The harassment must be extreme to amount to a change in the terms and conditions of employment.  Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Lindsey v. Whirlpool Corp.*, 2008 WL 4428416 (6th Cir. October 02, 2008) (internal quotation marks and citations omitted). The harassment must "be sufficiently severe or pervasive to alter the conditions of" the plaintiff's employment and create an abusive working environment.  *Larocque v. City of Eastpointe,* 245 Fed. Appx. 531 (6th Cir. 2007) (citations omitted).

Plaintiff testified at deposition that Schultz and Murtaugh said things to her of a sexual nature, but that she could not recall anyone else saying anything of that nature.  She testified to the following incidents. On one occasion, Murtaugh invited plaintiff to his room to lie down.  Murtaugh did not ask plaintiff to have sex, or indicate that the invitation was of a sexual nature. Plaintiff shook her head, and responded that she was a married woman. Although she does not remember specifically, she probably told Murtaugh that the comment was inappropriate.  Additionally, Murtaugh "told me how attractive I was. He untied my apron one time that tied in the back and he hit me on the rear end once."  Plaintiff told him, "thank you," for the attractive comment, but does not remember telling him that she was offended by it. In response to the hit on the rear end, plaintiff told Murtaugh that she "didn't appreciate that."  Murtaugh never did it again. These were the sole incidents involving Murtaugh which plaintiff found offensive or were of a sexual nature.  Plaintiff never complained to anyone in management about any of the incidents.

17

With regard to Schultz, plaintiff testified that once he commented that "for a skinny white boy I have a big penis or big dick." Plaintiff did not respond to him or she may have said that the comment was inappropriate.  Plaintiff did not complain to anyone in management about the comment.  Also, Schultz once told plaintiff

> about a woman that he bedded that was an employee of National City Bank and asked me to comp her table. And then he put his hands one time against the wall and dry humped it or did a pelvic thrust against it and shook his head from left to right about I did her, I did her.

Plaintiff told Schultz that she thought "it was disgusting," and Schultz "just laughed." Plaintiff did not complain to anyone in management about the incident.  On another occasion, plaintiff observed Schultz ask a cook in the restaurant to do a "boobie dance for him."  The cook "just laughed" and did the dance.  Plaintiff does not recall telling Schultz that she was offended by the incident.  Nor does she recall telling anyone in management about it.  (pltf. depo. 108-132)

In her brief, plaintiff states, "For months, plaintiff worked in a sexually hostile work environment filled with daily explicit comments, lewd remarks, jokes and gestures made by Hyatt managers." (Doc. 36 at 1) Plaintiff, however, relies on affidavit testimony which contradicts her prior sworn deposition testimony. Subsequent to her deposition testimony, plaintiff executed her affidavit.[5]   In her affidavit, plaintiff avers the following with regard to sexual harassment.  From August 2006 through May 2007, she was a victim of sexual harassment by Schultz and Murtaugh which was continual, ongoing and not sporadic.  Not a day passed at the Hyatt without a manager or supervisor engaging in some form of physical,

---

[5]     The affidavit, which reads like a brief in opposition, is 34 pages in length and contains 114 paragraphs.

18

visual, or verbal actions which would constitute sexual harassment as described in Hyatt's "A Manager's Guide to Preventing Harassment in the Workplace."  Some of the conduct included: Schultz repeatedly bragging about his sexual intercourse encounters with plaintiff's female co-workers; Schultz bragging about the size of his penis; Schultz impregnating a female co-worker at another Hyatt hotel and then asking plaintiff to mail the abortion check to that employee; Schultz's daily use of the word "fuck"; Schultz telling plaintiff that "you will always know when he gets laid (have sex) because you can see the smile on his face"; Schultz's daily use of foul and sexually explicit language; Schultz's frequent sexual conversations with plaintiff about women; Schultz's request to plaintiff to provide a complimentary meal to a woman with whom he had had sex, and his "dry humping" the wall; Schultz asking a female employee to do a "boobie dance"; Murtaugh grabbing plaintiff on the buttocks and inviting her to his hotel room; Murtaugh grabbing plaintiff and untying her apron; Schultz throwing money in plaintiff's face on a day when she challenged his retention of her tips; Schultz's daily reference to plaintiff as "mom."  Plaintiff also witnessed Justin Flores using sexually harassing remarks and gestures, and requesting a "boobie dance" of a female cook.

Plaintiff further avers the following with regard to complaints about the harassment. She made more than 30 verbal complaints of sexual harassment and discrimination to several different managers including Schultz, Serreyn, Murtaugh and Donald Price[6], but no investigation followed.  She "voiced [her] objections and complaints to managers about the

---

[6]     Plaintiff testified that Price was a manager in the restaurant, subordinate to Schultz.

conduct whenever it happened."  On April 26, 2007, following the "dry humping" incident,

plaintiff complained to Price who "just shook his head in disgust and apologized."  At her

termination meeting of May 12, 2007, plaintiff complained to Leuders about Schultz's

behavior but Leuders told plaintiff that her complaints were "not relevant." Plaintiff had a

"very strained working relationship with Schultz and Hyatt management because [she]

complained daily about sexist, sexually harassing, discriminatory, retaliatory, inappropriate

and other unlawful conduct in the workplace prior to May 10, 2007." (pltf. aff. ¶¶ 23-34, 78,

106)

   As discussed herein, to the extent that plaintiff's affidavit conflicts with her prior

deposition testimony, the affidavit testimony is stricken.

   The Sixth Circuit has recognized that a party "cannot create a genuine issue of fact

sufficient to survive summary judgment simply by contradicting his or her own previous

sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier

sworn deposition) without explaining the contradiction or attempting to resolve the disparity."

*Yanovich v. Zimmer Austin, Inc.,* 255 Fed. Appx. 957 (6th Cir. 2007) (citing *Cleveland v.*

*Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)).

    Without explaining the contradictions or attempting to resolve the disparities[7],

plaintiff's affidavit contains the following testimony adverse to her deposition.

   Plaintiff avers that she was subjected to continual harassment from August 2006

through May 2007.  Yet, she avers elsewhere in her affidavit that she was not sexually

---

[7]   Plaintiff's brief opposing the Motion to Strike only asserts that she has personal
knowledge of the declarations in her affidavit, and these assertions are admissible
as opinion testimony.

harassed until Schultz "arrived."  She testified at deposition that Schultz transferred to Cleveland around October 2006.

She avers that the harassment was continual, ongoing and not sporadic, and that not a day passed without a manager or supervisor engaging in sexual harassment.  Aside from the fact that plaintiff's averment that the harassment was ongoing is conclusory, plaintiff testified that only Schultz and Murtaugh said things to her of a sexual nature and that she could not recall anyone else saying such things.  (pltf. depo. 109) Furthermore, in her deposition she identified specific incidents and agreed that she had discussed everything of a sexual nature that Murtaugh said or did, and named all the things that Murtaugh did whether or not of a sexual nature that offended her.  (*Id.* 119) With regard to Schultz, plaintiff testified that the incidents identified in the deposition testimony were the ones of a sexual nature that plaintiff remembered the most.  (*Id.* 129-130) Finally, plaintiff was specifically asked at deposition whether she had "any facts to support" her sexual harassment and sex discrimination claims "other than what you've already told me about today?"  Plaintiff responded, "Not that I can think of right now."  (*Id.* 319) For plaintiff to now aver that Schultz and Murtaugh harassed her "continually" and on an "ongoing" basis and engaged in other specific incidents not mentioned in her deposition is contradictory to her deposition testimony wherein she was specifically asked whether the incidents identified were the only ones and plaintiff testified that she could recall no others.

Notwithstanding her deposition testimony that she discussed everything, plaintiff identifies in her affidavit the following actions taken by Schultz which were not included in her deposition:  impregnating the female employee, his daily use of the word "fuck,"his

21

telling plaintiff that you knew when he had had sex, his daily use of foul and sexually explicit language and his frequent sexual conversations about women.  Additionally, plaintiff's affidavit asserts that Murtaugh "grabbed" her on two occasions.  Yet, plaintiff expressly testified at deposition that Murtaugh did not grab her, but "hit" her on the buttocks.  And, that it happened on one occasion only.  (pltf. depo. 116-118)

Plaintiff avers that she observed Flores use sexually harassing remarks and gestures, and on more than one occasion asked a female cook to do a "boobie dance."  In her deposition, however, plaintiff did not identify Flores as engaging in sexual harassment and testified that she only observed Schultz request the dance once.  Plaintiff specifically testified that only Schultz and Murtaugh said things to her of a sexual nature, and that she could not recall anyone else doing so.  (pltf. depo. 108-109)

Finally, plaintiff's affidavit states that she endured sexual harassment when Schultz referred to her "daily" as "mom" or "mother."  In her deposition, however, she stated that she regarded this as a comment about her age.  Additionally, although she testified that "he would always call me mom," plaintiff did not say that it happened daily.

Excluding the contradictory affidavit testimony, the Court is left with the following incidents of sexual harassment: Murtaugh invited plaintiff to his room to lie down, told her she was attractive, untied her apron and hit her on the buttocks. Schultz commented on the size of his penis, told plaintiff about a women with whom he had had sex and asked plaintiff to provide her with a complimentary meal, did a pelvic thrust imitating a sexual motion and asked a cook to do a "boobie dance."

The Court agrees with defendants that the alleged conduct is not sufficiently severe or

22

pervasive as to alter the conditions of plaintiff's employment.

First, plaintiff's deposition testimony shows that she did not subjectively perceive the environment to be abusive.  She considered the comments to be "inappropriate" or "disgusting," but there is no evidence that she was unable to work or felt physically or otherwise threatened.

Second, plaintiff has not demonstrated that the conduct was objectively hostile or abusive.  In *Williams v. Gen. Motors Corp.,* 187 F.3d 553 (6th Cir. 1999), for example, the conduct was considered sufficiently severe or pervasive where "there was a steady stream of derogatory and profane remarks directed at the plaintiff, [and there were] sexually explicit comments about [plaintiff] and offensive comments directed at women in general over the course of a year."  *Mast v. IMCO Reclycling of Ohio, Inc.,* 58 Fed.Appx. 116 (6th Cir. 2003) Here, examining all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or merely offensive and whether it unreasonably interfered with plaintiff's work performance, the Court finds that the evidence does not show a hostile work environment.  The conduct was not continuous. Rather, plaintiff's deposition testimony shows that she was subjected to offhand comments and isolated incidents.  Plaintiff testified that once she told Murtaugh that she "did not appreciate" his action, he never engaged in other offensive conduct toward her.  Schultz's actions, although immature and offensive, did not permeate the workplace.  Plaintiff testified to one offensive comment he made and that he engaged in two other sexually inappropriate incidents.  On this basis, the evidence just does not amount to a hostile work environment.

Assuming plaintiff has satisfied the fourth element of her prima facie case, defendants

23

assert that she cannot satisfy the fifth element, i.e., employer liability.  This Court agrees.

The harassment was allegedly perpetrated by Schultz and Murtaugh, plaintiff's managers. In cases of supervisory harassment, as to the fifth element the employer is vicariously liable for the sexual harassment.  However, so long as the harassment did not result in a negative tangible employment action for the plaintiff, the employer has an available affirmative defense.  The employer must establish that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Thornton, supra* and *Deters v. Rock-Tenn Co., Inc.*, 245 Fed.Appx. 516 (6th Cir. 2007) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

"Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy."  *Thornton, supra* (citing *Ellerth* and *Faragher*). "[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Id.* (quoting *Clark v. United Parcel Service, Inc*., 400 F.3d at 341, 349-50 (6th Cir.2005).

As discussed in the factual section above, Hyatt had a sexual harassment policy which plaintiff received.  Plaintiff also received a copy of the open door policy.  The policies instructed that concerns were to be reported to the Human Resources Director, the General Manager, or a hotline which phone number was provided where concerns involved an

24

employee's immediate supervisor. Plaintiff testified at deposition that she understood the policies.  As also discussed above, plaintiff testified that she only complained [8] to Murtaugh or Schultz about their own behavior.  She testified that she did not complain to anyone in management about the comments or behavior.  Therefore, plaintiff did not utilize the policies.

Again, plaintiff's affidavit improperly presents testimony which conflicts with her earlier deposition testimony.  Plaintiff now avers that she made more than 30 verbal complaints of sexual harassment and discrimination to several different managers including Schultz, Serreyn, Murtaugh and Price, but no investigation followed.  Plaintiff also avers that she "voiced [her] objections and complaints to managers about the conduct whenever it happened."  Additionally, she avers that she complained to Price following the "dry humping" incident, and to Leuders at her termination meeting about Schultz's behavior.

Plaintiff, however, testified at deposition that she never complained to anyone within management regarding the incidents involving Schultz and Murtaugh. Plaintiff was specifically asked at deposition whether she complained to anyone within management that Murtaugh had asked her to go to his room.  She testified:

A.  I just complained to Don [Murtaugh].

Q.  You just said, I'm a married woman, or words to that effect?

A.  Correct.

Q.  But never notified anyone else in management about that?

---

[8]     To say that plaintiff "complained," to Murtaugh and Schultz is a very liberal construction of plaintiff's deposition testimony.  As recounted above, in some instances plaintiff only shook her head, or *may have* said the comment was inappropriate or disgusting.

25

A.  I do not think that I did.

(pltf. depo. 119-120) When asked whether she complained to management when Murtaugh hit her on the rear end and untied her apron, plaintiff testified:

A.  I complained to him.

Q.  To Don [Murtaugh]?

A. Correct.

Q.  And how did you complain to him?

A. I told him I thought that was inappropriate.

***

Q.  But you never complained to anyone other than telling Don that it was inappropriate?

A.  I don't believe I did.

Q.  Okay.  And why didn't you complain about Don to anyone in management other than notifying him that you didn't like it?

A. I don't know.

(*Id.* 120) Plaintiff was specifically asked whether she complained to anyone within management when Schultz commented about the size of his penis.  Plaintiff responded, "Not that I recall."  (*Id.* 122-124)  Further, when asked at deposition whether she complained to anyone within management about the dry humping incident, plaintiff replied, "I don't think so." And, when asked whether she complained to anyone in management that Schultz had asked her to "comp someone's meal," plaintiff replied, "I- - not within management, no."  (*Id.* 127)  Finally, plaintiff was specifically asked at deposition whether she told anyone within management about the "boobie dance" incident.  Plaintiff responded, "I don't recall."  (*Id.*

26

129)  Plaintiff's averment that she made complaints to Serreyn, Price and Leuders directly

contradicts this testimony.

Furthermore, while plaintiff testified at deposition that she complained to Serreyn

about "marrying alcohol," tips and compensation for Impact Training, she never testified that

she complained to him about sexual harassment.  (*Id.* 59, 138, 163) Plaintiff did not testify

that she complained to Price at all. Finally, while plaintiff avers that she complained to

Leuders at her termination meeting about Schultz's behavior, plaintiff specifically testified at

deposition:

> Q.  Did you claim at any point during the termination meeting that Joey [Schultz] had
> been sexually harassing you?
>
> A.  I don't know.
>
> Q.  Did you claim- - I'm sorry?
>
> A. I don't remember.

(pltf. depo. 194-195) While plaintiff then testified that she "stat[ed] something about Joey's

actions" during the termination meeting, she further testified:

> Q.  And what did you say [about Joey's actions]?
>
> A.  I don't remember exactly what I said.
>
> Q.  Do you remember anything about what you said, do you remember anything at all?
>
> A.  I remember asking, like I said, how do I know he didn't take them [the missing
> documentation] from me; he's stolen from me before, when some documentation was
> gone. I think I even said, how do I know it wasn't one of the guests he slept with, you
> know, and he comp'd something that I was unaware of.
>
> Q. Do you remember anything else you said?
>
> A. No.

(*Id.* 195-196) Thus, although specifically asked, plaintiff did not testify that she complained

to Leuders at her termination meeting that Schultz sexually harassed her.[9]

Finally, plaintiff avers that she delivered a memorandum regarding Schultz's behavior

to Stephen Stewart on May 3, 2007 by placing it in his business mailbox. (pltf. aff. ¶ 83)

Plaintiff previously testified at deposition that she remembered writing the memorandum, but

she did not remember how she delivered it or exactly when she delivered it. (pltf. depo. 234-

236)

The Court assumes that Stewart had the memorandum prior to plaintiff's termination.

However, the memorandum does not complain about sexually harassing behavior.  (pltf. aff.

Tab 8) In the memorandum, plaintiff addresses "several situations" which occurred in the

restaurant.   The only reference to Schultz's sexually inappropriate behavior states:

> Today, 3 May 2007, I experienced yet another uncomfortable situation.  Joey
> [Schultz] told me to comp table 24.  I cannot comp a table w/o a manager's card.  I
> also am not tipped on comp's and didn't understand the reasoning behind it.  Joey then
> told me that he had slept w/the guest over the summer and wanted to buy her
> breakfast.  He continued by stating that he knew it was inappropriate to sleep at The
> Hyatt with our guests, but that he had been away from home and was horny.  Why he
> shared that with me, I do not know, however, it was inappropriate and a disappointing
> behavior.

The memorandum does not convey that plaintiff was somehow threatened or perceived the

---

[9]      At most, plaintiff told management that Schultz had provided a complimentary
meal to a woman he had slept with. There is no indication that plaintiff found this
to be harassment, but rather evidence that Schultz was dishonest.  Leuders
submits her own affidavit wherein she avers that plaintiff never complained to her
during her employment that she was being sexually harassed.  Leuders did aver
that during the termination meeting plaintiff alleged that Schultz had "provided a
meal at no cost to a particular female guest that he had slept with," but that
plaintiff did not claim that Schultz's action was somehow discriminatory toward
plaintiff. (Leuders aff.)

incident to be sexual harassment, or that it otherwise unreasonably interfered with her work performance.   Other than this paragraph, the remaining paragraphs of the memorandum outline other complaints unrelated to any sexually harassing behavior.  Plaintiff recounts the following other incidents.

> - On Easter, plaintiff  was late to work due to a snow storm.  Schultz rang orders under plaintiff's name and told her that he was going to keep her tips.  Plaintiff objected because she had to pay the taxes on the tips.  The next day, after plaintiff confronted Schultz, he "handed" plaintiff some cash and she told Schultz that she was proud that he did the right thing.

> - On April 21, 2207, a male server took one of plaintiff's tables.  When plaintiff confronted him, the server yelled at plaintiff.  Plaintiff feared that the server might physically harm her because she had heard that he had previously harmed a server at another restaurant. Plaintiff told Schultz who said he could not do anything because he did not witness the confrontation.  Also, the male server was assigned to serve a group of 25 women, "a guaranteed gratuity."  Finally, the server yelled at a cook the previous week, causing her to improperly prepare orders.

> - On St. Patrick's Day, the restaurant was inadequately staffed and plaintiff was the only one working in the restaurant with experience with this busy day.  Plaintiff had to take over the tables of other servers who were not prepared.  Plaintiff ending up doing 53% of the restaurant business that day.  When she brought her concerns to Schultz, he told plaintiff, "good job, I'm sure you made lots of money, and I'm going partying."

> - Although plaintiff was aware that a guest "wrote a wonderful comment card" about her  on St. Patrick's Day, plaintiff never heard anything about it from her managers.

(pltf. aff. Tab 8) The memorandum's purpose was not to complain about a sexually hostile working environment.  Other than the incident where Schultz asked plaintiff to "comp" the meal, plaintiff does not mention the other alleged incidents of sexual harassment.

Other than her affidavit testimony[10], plaintiff points to defendants' following

---

[10]     Plaintiff also submits the affidavit of Lillian McMarlin who avers that she was a bartender for The 1890 restaurant while plaintiff was employed there.  She avers that the work environment under managers Schultz and Justin Flores was "openly

admissions as evidence that she reported the sexual harassment to various managers:

- The Open Door Policy and Policy Against Harassment may be used by Hyatt personnel to report allegations of harassment and discrimination verbally and orally to management personnel.

- Prior to May 13, 2007, The 1890 management personnel did not reduce to writing or record the verbal complaints made by all female union employees who used the Open Door Policy to complain to managers.

- Managers and supervisors did not place a written memorandum in plaintiff's personnel file concerning alleged verbal complaints of harassment made to management.  Plaintiff, however, did not make any such verbal complaints.

- Prior to May 12, 2007, Hyatt employees were not required under the Policy Against Harassment to make a second or subsequent complaint of harassment or discrimination with a Hyatt senior manager after making an initial complaint with a non-senior manager.

- The Policy Against Harassment states that all reported complaints of unlawful harassment would be promptly investigated and corrective action taken where warranted.

(Doc. 36 Appx. E and F) None of these admissions show that plaintiff made complaints to management about sexual harassment.

On the basis of the evidence before this Court, defendants have demonstrated that reasonable care was exercised to prevent and correct promptly any sexually harassing behavior based on the policies that were in place, and plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by the defendants in that she never informed management of the alleged sexual harassment. Therefore, plaintiff cannot

discriminatory" towards women and "filled with sexually inappropriate conduct." She also avers that the Open Door Policy was a "sham," and that the Union never bothered to respond to the legitimate complaints of female staff members. (McMarlin aff.)  Defendants assert that this affidavit contains conclusory statements and subjective opinions and should not be considered.  This Court agrees.

30

satisfy the fifth element of the prima facie case.

Accordingly, summary judgment is warranted on this claim.

### (b) sex discrimination

In examining plaintiff's federal and state sex discrimination claims, the Court employs the same burden shifting analysis set forth above with regard to age discrimination.[11]  To make out a prima facie case of gender discrimination, plaintiff is required to show that (1) she is a member of a protected group, (2) she was subjected to an adverse employment decision, (3) she was qualified for position, and (4) she was replaced by person outside protected class, or similarly situated non-protected employees were treated more favorably.  See *Novotny v. Elsevier*, 2008 WL 4090646 (6th Cir. August 29, 2008) (citations omitted).

Plaintiff asserts that she was the only Hyatt server/trainer who was not paid a higher hourly wage for training other personnel. Plaintiff, however has no evidence that any other server at the restaurant was given a higher pay to train employees.  Thus, she cannot satisfy the fourth element.

Summary judgment is warranted on this claim.

### (4) Retaliation (Count Four)

Plaintiff asserts that she was retaliated against in violation of state and federal law. The claims are analyzed in the same manner.  *Lindsey v. Whirlpool Corp.,* 2008 WL 4428416 (6th Cir. October 2, 2008) (citations omitted).   In order to establish a prima facie case of retaliation under Title VII, plaintiff must establish that (1) she engaged in protected activity,

---

[11]     As discussed above, plaintiff does not have direct evidence because the "mom" comments were not related to the decision-making process.

(2) defendants  knew of the exercise of the protected right, (3) an adverse employment action

was subsequently taken against plaintiff and (4) there was a causal connection between the

protected activity and the adverse employment action. *Hall v. Michigan State Police Det*.,

2008 WL 4093565 (6th Cir. September 02, 2008) (citations omitted).  If the plaintiff

establishes a prima facie case the burden shifts to defendants to articulate a legitimate,

nondiscriminatory reason.  Plaintiff must then demonstrate by a preponderance of the

evidence that the legitimate reason offered was in fact only a pretext designed to mask

retaliation.  *Id.* (citations omitted)

Defendants assert that this claim fails because plaintiff did not engage in protected

activity and, consequently, there could have been no retaliatory motive for plaintiff's

termination. Relying on the evidence discussed above, plaintiff asserts that she did report

sexual harassment.  As discussed above, however, the record does not show that plaintiff

made these reports. [12]  Although the timing of the May 3 memorandum to Stewart in relation

to Schultz's review of plaintiff's daily transactions on May 9 appears suspicious, the Court

cannot conclude that it is retaliatory because, as discussed above, the content of the

memorandum does not amount to  reporting sexual harassment, i.e., engaging in protected

activity.

In addition to the evidence relied on above, plaintiff, relying on her affidavit

---

[12]     The evidence only shows that defendants became aware that plaintiff was alleging
a hostile work environment and discrimination after she filed her EEOC charge
subsequent to her termination.  (Leuders aff.; Stewart aff.)  In response to the
allegations, Leuders conducted an investigation but was unable to substantiate
any of the complaints.  Leuders, however, did give Schultz a written counseling
based upon unprofessional comments that he admittedly made in the workplace.
(Leuders aff.)

testimony, also asserts that she engaged in protected activity by objecting to Schultz's "mom" comments, and complaining to Schultz about him treating female employees differently than male employees. (pltf. aff. ¶¶ 37-38, 51, 57, 103) In particular, plaintiff avers that she "repeatedly and politely asked Schultz" to stop his daily practice of calling plaintiff "mom"; she complained to Schultz and other of the restaurant managers that younger male employees were never subjected to investigations for violation of Hyatt policy, including attendance, marrying alcohol, coming to work intoxicated, threatening co-workers with violence and cash handling matters; she complained to Schultz and Serreyn about her hourly wages for Impact Training; and she complained to Schultz about his retaining plaintiff's tips on Easter.

Opposing an apparently discriminatory practice can be a protected activity for retaliation purposes. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir.1989). However, plaintiff testified at deposition that she was never disciplined for marrying alcohol (or refusing to do so), coming to work intoxicated, or engaging in harassing behavior. (pltf. dpo. 138, 141) Thus, although she did not testify at deposition that younger male employees were not investigated for violating these policies, plaintiff does not explain how the failure to discipline the younger male servers was somehow discriminatory. Further, when asked at deposition whether other servers who were missing ten signed receipts in one day (as plaintiff was found to have done) were not terminated, plaintiff identified Veronica, Devon and Tim. Veronica is a female, not a younger male. Additionally, upon further questioning, plaintiff just assumed that Devon committed the infraction because one day he laughed and said that he rarely turned in paperwork. Similarly, Tim had only said the coupons were a joke. (pltf. depo. 200-201) Plaintiff did not testify that she complained that

33

the younger males were not investigated for these cash handling matters.  Finally, plaintiff may have complained regarding her wages for the Impact Training and Schultz's retention of the tips, but there is no evidence that plaintiff complained that this had anything to do with her sex or that younger male servers were treated differently on these matters.

Finally, plaintiff avers that on April 17, 2007, when she met with Schultz to address the issue of his taking her tips on Easter, Schultz admitted to her that he had been accused of sexual discrimination.  Plaintiff also avers that during the conversation, plaintiff told Schultz that he was a sexist and always discriminated against the female employees of the restaurant. (pltf. aff. ¶ 39)  When asked at deposition, however, plaintiff did not mention anything about this part of the conversation.  And, when asked specifically whether she remembered saying anything else to Schultz when he returned her tips, she testified that she did not remember. (pltf. depo. 164) Moreover, plaintiff's May 3, 2007 memorandum to Stewart which (among other things) relates the incident regarding the Easter tips, mentions nothing about a conversation regarding sex discrimination.  The memorandum recites plaintiff's feeling that Schultz's retention of her tips was "fraudulent" because of the tax implications.  The memorandum further recalls the conversation plaintiff had with Schultz:

> The next day that I worked, I confronted [Schultz] with my concern.  I told him that I thought it was inappropriate that he used my name and that he took tips.  He became very defensive and did not like what I was communicating to him.  I told him that, unlike other employees, I was telling him what my concerns were, and telling him face-to-face.  He then remarked, if you need the $6 so badly, I'll give them to you. That was not my point, and I told him that.  Two hours later, he asked to speak to me and handed me some cash. At that time, I expressed to him that I was proud that he did the right thing.

(Doc. 36 Tab 8) Plaintiff mentioned nothing to Stewart about a discussion regarding discriminatory behavior.

34

The Court finds plaintiff's averment that she complained to Schultz about sex discrimination to be contradictory and self-serving.

On this basis, plaintiff fails to show that she engaged in protected activity and her claim fails.[13]  Assuming that asking Schultz to stop calling plaintiff "mom" constitutes engaging in protected activity, or that plaintiff has otherwise satisfied a prima facie case of retaliation, defendants assert that plaintiff cannot demonstrate pretext.  This Court agrees.

Defendants have asserted a legitimate reason for plaintiff's termination, i.e., she violated cash handling policies.  Plaintiff sets forth the following bases as evidence that this reason was actually a pretext to cover up defendants' retaliation.  None are persuasive.

Plaintiff asserts that several days after her termination, Hyatt changed its story and told the Ohio Department of Job and Family Services (ODJFS), after plaintiff applied for unemployment benefits, that plaintiff was terminated because of a physical fight and an argument with a manager.  Plaintiff points to a May 15, 2007 ODJFS Notice to plaintiff

---

[13]     In a footnote, plaintiff points to her affidavit testimony that on May 9, 2007, she sought the legal advice of an attorney while on her break at the restaurant.  After the conversation with the attorney concluded, Schultz demanded to know why plaintiff was speaking with the attorney and what the substance of the conversation was.  Plaintiff refused to tell Schultz.  (pltf. aff. ¶ 48) Plaintiff asserts that the timing of this incident is suspicious as she never returned to work after that day.

Plaintiff testified at deposition, however, that she talked with Mr. Summers (her current attorney) while he was a guest at the Hyatt, but that he was not her attorney until after she was terminated.  (pltf. depo. 172-174) Plaintiff also testified at deposition that she did not know the exact date on which Schultz asked plaintiff about her conversation with Mr. Summers.  When asked if she had any idea, she responded, "I would say probably in April.  Maybe in March even." (*Id.* 174) Plaintiff's averment that the incident occurred on May 9, the day Schultz audited her work, is contradicted by her earlier deposition testimony.

wherein it states, "On 5/14/07, the following eligibility issue was raised: Discharge-

Argument/fight w/ supervisor... the source of the issue is initial Claim Application..."  (Doc.

36 Tab 11)  Thus, it is clear that this information was gleaned from *plaintiff's* application for

benefits (which was filed on May 14, 2007), and not from defendants which had not even

provided its response yet to the ODJFS.  (Doc. 40 Ex. 3)  In fact, defendants notified the

ODJFS that plaintiff was terminated for violation of the cash handling policy and

misappropriation of hotel funds.  (Doc. 40 Ex. 4)

 Next, plaintiff points to Hyatt's statement in its August 2007 Position Statement to the

EEOC that after the initial audit of May 9, 2007, Schultz notified plaintiff that she had been

suspended pending investigation.  Plaintiff asserts that she was not given a reason for the

discipline on May 9. Plaintiff points to case law holding that failure to timely mention a

reason for discipline is evidence of pretext.  Plaintiff, however, does not dispute that she was

fully informed of the basis for her discharge at the termination meeting of May 12.

 Plaintiff also asserts that the Hyatt told the EEOC that plaintiff committed criminal

acts, yet criminal charges were never filed and plaintiff was never convicted.  While the

Position Statement states that plaintiff was "guilty" of multiple cash handling violations and

was "guilty" of misappropriation of funds, it is clear that defendants terminated plaintiff for

violating *Hyatt's* policy and not a criminal statute.  Merely because defendants chose not to

file criminal charges against plaintiff does not show that their reasons for terminating her

were false.

 Plaintiff further contends that defendants improperly conducted an after-the-fact

review of her transactions from September 2006 and April 2007 in an effort to show that she

had a history of cash handling problems.  This Court disagrees.  As discussed above, the

initial audit conducted by Schultz on May 9, 2007 revealed multiple cash handling violations

and prompted an additional audit of plaintiff's April 25 and May 2007 transactions.  Hyatt's

Controller participated in the second audit which revealed further violations.  The decision

was then made to terminate plaintiff.  The evidence shows that after her termination, plaintiff

insinuated that Schultz took the missing documentation.  This led to a further audit of

transactions conducted by plaintiff prior to Schultz's arrival.  In particular, plaintiff testified

at deposition that during the termination meeting, she raised the issue that Schultz could have

stolen the missing documentation.  (pltf. depo. 195-196) Plaintiff also stated in her EEOC

charge that she did include the missing coupons and receipts with her paperwork, and that

Schultz "falsely accused" her of mishandling the coupons.  (Doc. 32 Ex. 19) Likewise, in her

Union grievance asserting termination without just cause, plaintiff stated that while she was

terminated because of the missing vouchers, all restaurant employees, including Schultz, had

access to the vault room. (pltf. depo. Ex. 16) Accordingly, an additional audit was performed

of plaintiff's transactions during a two week period in September 2006, prior to Schultz's

tenure.  This audit also revealed cash handling violations.  (Schultz aff.)  Thus, there is no

evidence that defendants committed this post-termination audit in an effort to show that

plaintiff's termination was justified.

Finally, plaintiff asserts that neither of the other decision makers, i.e., Stewart or

Leuders, conducted an independent investigation of plaintiff's work without Schultz's

involvement.  Nothing requires that Leuders or Stewart conduct their own investigation, and

the documents presented in support of plaintiff's termination clearly show the basis for the

decision. Additionally, after conducting the initial audit, Schultz was assisted by the Hyatt Controller who conducted the second audit.

For these reasons, plaintiff fails to show pretext in addition to failing to establish her prima facie case. Dismissal of the retaliation claim is warranted.

### (5) Ratification (Count Five)

Defendants do not address this claim separately on the basis that it is merely a legal principal providing for corporate liability for the acts of its agents and liability is addressed in connection with each of the claims. Plaintiff asserts that her managers had notice of her complaints of harassment and discrimination but failed to act. As discussed elsewhere, plaintiff does not show that she made such reports.

### (6) Intentional Infliction of Emotional Distress (Count Six)

The applicable standard is well-recognized:

> To survive summary judgment on his claim of intentional infliction of emotional distress, [plaintiff] must show that: (1) [defendant] intended to cause emotional distress, or knew or should have known that [its] actions would result in [plaintiff's] serious emotional distress, (2) [defendant's] conduct was extreme and outrageous, (3) [defendant's] actions proximately caused [plaintiff's] emotional injury, and (4) [plaintiff] suffered serious emotional anguish. The Ohio Supreme Court adopted the language from the Restatement of the Law 2d, Torts (1965) which states that the defendant must act with more than criminal intent, and that to be liable for this tort, the defendant's conduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Graham v. Best Buy Stores, L.P.,* 2008 WL 4679547 (6th Cir. October 22, 2008) (internal citations and quotations omitted).

Plaintiff has not demonstrated that any of the required elements have been satisfied.

### (7) Loss of Consortium (Count Seven)

The Sixth Circuit has recognized that under Ohio law, **"A claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury."** *Campbell v. PMI Food Equipment Group, Inc.,* 509 F.3d 776 (6th Cir. 2007) (citations omitted).  Because plaintiff Tamra Magolis's claim fails and because there is no evidence of bodily injury sustained, this claim fails as well.

### (8) Negligent Hiring (Count Eight)

Under Ohio law, negligent hiring, retention, and supervision claims require that five elements must be proved: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries." *Watson v. City of Cleveland*, 202 Fed.Appx. 844 (6th Cir. 2006) (citations omitted).

Plaintiff asserts that the Hyatt knew, or should have known, of the managers' unlawful conduct in failing to investigate plaintiff's complaints.  As demonstrated herein, however, plaintiff has not shown that she made such complaints.

### (9) Wrongful Discharge (Count Nine)

Plaintiff alleges that defendants' conduct in discharging her is prohibited by the public policy of Ohio as expressed in the anti-discrimination and retaliation statutes discussed above. The Ohio Supreme Court, however, in *Leininger v. Pioneer Natl. Latex*, 115 Ohio St.3d 311 (2007), held that there is no need to recognize a common law action for wrongful discharge if

there already exists a statutory remedy that adequately protects society's interests.  The court specifically recognized that Ohio Revised Code § 4112 provides complete relief for discrimination.  On this basis, plaintiff's public policy claim fails.

Plaintiff additionally claims that defendants violated public policy by Schultz's deliberate questioning of plaintiff regarding her private, confidential and privileged discussions with her counsel.  As discussed above, however, plaintiff testified that Mr. Summers was not her attorney at the time she engaged in the conversation which Schultz questioned.  Thus, the discussions with Mr. Summers, at that point, were not confidential and privileged discussions with counsel.

### (10) Defamation and Negligence (Counts Ten and Twelve)

Plaintiff appears to abandon these claims, and summary judgment is appropriate for the reasons set forth by defendants.

### (11) Breach of Contract (Count Eleven)

Count Eleven alleges a state law claim for breach of contract.  Plaintiff asserts that defendants breached the CBA by failing to timely notify her regarding cash handling matters for the period between April 23 and May 9, 2007, and by failing to give her an opportunity to cure these matters.

It is well-recognized that "[w]here a decision on a state law claim is inextricably intertwined with consideration of the terms of a labor contract, and when application of state law to a dispute requires the interpretation of a collective-bargaining agreement, those state law claims are preempted by § 301 of the LMRA." *Simoneau v. General Motors Corp.*, 85 Fed.Appx. 445 (6th Cir. 2003) (citing *Jones v. General Motors Corp.*, 939 F.2d 380, 383 (6th

40

Cir.1991) and *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407(1988)). The "classic § 301 preemption case arises from a state law breach of contract claim," such as the one presented here. *Banks v. Alexander,* 2008 WL 4297224 (6th Cir. September 19, 2008).

Plaintiff's preempted breach of contract claim, then, actually presents a hybrid § 301 suit for breach of a labor contract. *Id.* at 384. To prevail in a hybrid § 301 action, plaintiff must prove both that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation of the employee. *Id.*

As stated above, plaintiff failed to exhaust her administrative remedies because her only grievance asserted that the Hyatt did not have just cause to terminate her. Even if plaintiff did exhaust, her claim fails on the merits.

In her brief, plaintiff appears to have abandoned her allegation that Hyatt breached the CBA by not allowing her the opportunity to rectify her violations of its cash handling procedures. Plaintiff does argue that the Hyatt breached the CBA by failing to present her with discipline on May 10, 2007 or with a formal notice of disciplinary action on that date despite the fact that Schultz claims that he told plaintiff by phone on that date that she had been suspended. Plaintiff was never presented with any such "termination notice" at her termination meeting.

Plaintiff points to the provision of the CBA which states, "Discipline shall be presented to the employee within a reasonable time from the point that the Human Resources Department has determined that discipline is warranted." (CBA Article 14.7) Plaintiff argues that this provision was violated because Schultz did not present her with a formal notice of

41

discipline on May 10. The Court disagrees. This provision of the CBA only requires that discipline shall be presented "within a reasonable time" after Human Resources determines that it is warranted.  There is no evidence that this was not done.  Schultz learned of the discrepancies on May 9, 2007, and an investigation was conducted promptly.  It was then determined that plaintiff had committed the violations.  On May 12, 2007, plaintiff met with Lueders and Schultz who, in the presence of Union Steward Barbara Winters, notified plaintiff that her employment was being terminated for multiple cash handling policy violations and misappropriateion of hotel funds. (Schultz, Leuders and Winters affs.)  Plaintiff does not dispute that she was given the reasons for her termination at this time.

Plaintiff also argues in her brief that the Hyatt violated the CBA by using her expired 2005 and 2006 written warnings to justify her termination. These warnings, however, were not used as a basis for plaintiff's termination. (pltf. depo Ex. 12).

For these reasons, plaintiff's breach of contract claim fails.

**<u>Conclusion</u>**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.



/s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Date:  11/24/08

42